WALKER ET AL. *v.* THE STATE OF INDIANA, EX REL.
STINSON, AUDITOR OF VANDERBURGH
COUNTY, ET AL.

[No. 21,495.   Filed June 9, 1911.]

1. OFFICERS.—*Bonds.—Breach.—Complaint.—Defective Paragraphs. —Judgment on Good One.*—In an action on the official bond of a county treasurer, defects in one paragraph of complaint are not available where the paragraph on which the judgment rests contains no defect.   p. 45.

2. OFFICERS.—*County Treasurers.—Receipting for Cash and Receiving Notes.*—The sureties on the official bond of a county treasurer are liable for the amount of notes owed by him to his predecessor and accepted by him instead of cash from such predecessor, such predecessor being ready and willing to pay the cash.   pp. 46, 47.

3. OFFICERS.—*Bonds.—Breach.—Complaint.*—A complaint on a county treasurer's bond, alleging that defendant served as treasurer for a certain time, that he received, collected, was charged with, and had in his possession a certain sum belonging to his county, and that he violated his bond in failing to account therefor, covers an alleged default in receipting for money from his predecessor when he received nothing but notes executed and owing by him to such predecessor.   p. 47.

4. OFFICERS.—*County Treasurers.—Advance Payments.—Liability.* —A county treasurer is not liable on his first term bond for ad-

vance payments actually made during his first term in anticipation of orders to be issued, where the orders were issued and credit taken for their payment during his second term; and in determining the liability of the two bonds such advance payments should be credited on the first bond and charged against the last. p. 50.

5. OFFICERS.—*Treasurers.—Default.—Application of Payments.—* The proper application of payments on two treasurers' bonds, given for different terms, is a matter to be determined from the evidence; and where there is evidence justifying the trial court's decision, it will not be disturbed. p. 53.

6. OFFICERS.—*Treasurers.—Default on First Bond.—Payment during Second Term.—Liability.—*A county treasurer who misappropriates public money during his first term is liable upon his official bond therefor; and his repayment of the funds so misappropriated, from the revenues received during his second term will not relieve his first term sureties nor impose any liability therefor upon his second term sureties. pp. 53, 55.

7. OFFICERS.—*County Treasurers.—Several Funds.—Liability.—*A county treasurer having undistributed money in his custody collected for several municipalities, is liable for the full amount thereof misappropriated, in an action by the county auditor, and the money, held in bulk and undistributed, for the purposes of such an action, is considered as the money of the county; but when so recovered it must be prorated to the municipalities rightfully entitled thereto. p. 54.

8. LIENS.—*Officers.—Bonds.—*Liens attach to the real estate owned by a public officer at the time of the commencement of an action upon his official bond for the misappropriation of public funds (§636 Burns 1908, §609 R. S. 1881). p. 62.

9. OFFICERS.—*Bonds.—Payments.—Application of.—*The first term sureties on an official bond have no right to money paid by the second term surety in excess of the amount alleged to have been realized by such second term surety from property received from the principal to apply on the deficit. p. 62.

10. OFFICERS. — *Bonds.— Defaults.— Payment.— Application of.—* Where a defaulting officer conveyed his property to be converted into cash and applied on his deficit, the full amount of his second term deficit being paid, the balance should unquestionably be applied to the first term deficit. pp. 62, 64.

11. PRINCIPAL AND SURETY.—*Subrogation.—*Where a second term surety secures property from his principal, a county treasurer, with which to pay his obligation as surety on such treasurer's bonds, and the property, when converted, is more than sufficient, the county can require an accounting for the excess for application on the balance due; or if the first term sureties have been

compelled to pay on his deficit, they are subrogated to the rights of the county to such excess. p. 64.

12. Officers.— *Sureties.—Cross-Complaints.— Equitable Rights.—* In an action against a county treasurer and the sureties on his two bonds, the suretyship of the sureties being pleaded, it is not reversible error to sustain a demurrer to a cross-complaint of the first term sureties against the principal and the second term surety, alleging that such second term surety had received and converted such treasurer's property to the payment of its obligations and that such property was purchased with funds abstracted during such first term, where it was shown that the property in question had been converted into money and the proceeds applied to the payment of the deficit, the balance being returned to such treasurer, that the amount in excess of the second term deficit was sufficient to cover the amounts abstracted during the first term and invested in such property, and where the commencement of the action created a lien against such treasurer's real estate, the judgment requiring his property to be first exhausted. p. 64.

13. Principal and Surety.—*Liabilities.—Contribution.—Officers.— Bonds.*—The first term sureties of a public officer, after payment of the amount due, may maintain a suit for contribution against the second term surety who has received an excessive share of the principal's property to apply on the deficit for the second term. p. 67.

14. Fraudulent Conveyances.— *Setting aside.— Sureties.— Payment of Debt.*—Ordinarily a surety must pay his suretyship debt before he can maintain a suit to set aside his principal's alleged fraudulent conveyance. p. 67.

15. Officers.—*Bonds.—Equitable Rights of Sureties.—Determination of, in Action on Bond.*—In an action to recover upon an official bond, the equitable rights of the sureties to the application of the principal's property may properly be determined. p. 67.

From Gibson Circuit Court; *Frank H. Hatfield,* Special Judge.

Action by The State of Indiana, on the relation of Harry Stinson, as Auditor of Vanderburgh county, against John P. Walker and others. From a judgment for plaintiff, defendants appeal. *Reversed.*

*Charles Martindale* and *George A. Cunningham,* for appellants.

*Miller, Shirley & Miller, Samuel Dowden, Oscar R. Luhring, Charles W. Wittenbraker, Daniel H. Ortmeyer* and *Robinson & Stilwell,* for appellee.

Cox, J.—Relator brought this action upon two successive bonds, given by John P. Walker as treasurer of Vanderburgh county, to secure the faithful performance of his duties as such treasurer. The first bond, covering the term from January 1, 1904, to December 31, 1905, was executed by Walker, as principal, and appellants, other than Constanza Lauenstein, and the since deceased husband of the latter who took his property by will, as sureties. The second-term bond, covering the term from January 1, 1906, to December 31, 1907, was executed by Walker, as principal, and appellee Federal Union Surety Company, as surety.

Before the close of his second term, Walker was found to be a defaulter, and at the request of the Board of Commissioners of the County of Vanderburgh resigned as such treasurer on January 26, 1907.

An examination of his books as treasurer disclosed that at the close of his first term he had failed to turn over to himself, as his own successor, a part of the public moneys that had come into his hands as such treasurer during that term, and that at the time he resigned and his successor was appointed he had failed to account to his successor for a part of the public moneys that had come into his hands as such treasurer during his second term.

This action was brought by the State, on the relation of the county auditor, against Walker and the sureties on the two bonds, to recover the amount due from Walker as such treasurer, and for which he had failed to account.

The complaint was in two paragraphs, appellants' demurrers to which were overruled.

Appellee Federal Union Surety Company answered the complaint by general denial and plea of payment, and also filed a cross-complaint setting up its suretyship. Walker answered the general denial, was defaulted on the trial, and formally declined to join in the appeal, and in using the term appellants in this opinion it is meant to indicate those charged with a liability on his first-term bond other than

himself. Appellants answered the general denial and pleas of payment and partial payment, and also filed a cross-complaint setting up their suretyship. On these pleadings the issues were closed by replies of general denial. The trial court made special findings of facts and stated conclusions of law thereon.

The court found, in substance, that the first-term bond, for the period stated and with the sureties before mentioned, had been executed; that during that term Walker received, by virtue of his office, and converted to his own use, $54,152.49; that said sum had not been repaid, nor any part thereof; that the second-term bond for the period stated and with the surety before mentioned, had been executed; that Walker resigned as such treasurer on January 26, 1907, and a successor was appointed; that during his second term Walker received, by virtue of his office, and converted to his own use $11,951.84; that the board of commissioners gave Walker credit for $2,310.96, as a credit on the second-term shortage, leaving $9,640.88, as the amount that Walker received by virtue of his office and converted to his own use during the second term; that the Federal Union Surety Company on February 22, 1907, tendered to the county, $17,749.15, in full settlement of any liability on the second-term bond; that this amount was by certified check, and was accepted by the treasurer of the county on February 28, 1907, in full settlement of all liability on the second-term bond, provided it should be found that the shortage for that term did not exceed that amount; that before said payment by the Federal Union Surety Company was made, Walker had transferred to the vice-president of the surety company certain property, under a written agreement that the company should sell the property and apply the proceeds to the second-term shortage, the balance, if any, to be turned back to Walker; that all of this property was purchased by Walker with money collected as treasurer during his first term, except $1,000, which he paid for certain trust com-

pany stock with money collected as treasurer during his second term, and $1,000, which he paid on another piece of property with money collected as treasurer during his second term; that a part of this property transferred by Walker to the surety company was, subsequent to the payment by the surety company of the sum of $17,749.15 into the treasury as before stated, sold, and the surety, in reimbursement received as the proceeds thereof $17,309.99, the unsold part of the property being returned to Walker.

As conclusions of law the court stated that relator is entitled to a judgment against appellants in the sum of $54,152.49, which with interest and penalty thereon amounted to $66,912.66, together with costs, and that the relator was not entitled to any judgment against the Federal Union Surety Company.

It may be said that nothing in this appeal raises any question as to the right of relator to recover on the two bonds the sum of the shortages found to exist in the two terms. The questions all turn on the sums to be recovered from the sureties on each bond.

Under the assignment questioning the sufficiency of the complaint, counsel for appellants are satisfied merely to assert in their brief that "the complaint did not allege

1. that the funds alleged to have been received and collected were received and collected by virtue of his office," and that "the original complaint does not aver that in the first term there was any breach of the bond." No elaboration of these points is made by argument, and no authority is cited. It is sufficient answer to these vague objections to say that as the amended second paragraph of complaint is open to neither objection made, and as it clearly and conclusively appears that the special findings are based on this paragraph, the overruling of the demurrer to the original or first paragraph, even if erroneous, was harmless. *Robinson* v. *Dickey* (1896), 143 Ind. 205, 52 Am. St. 417; *Marvin* v. *Sagar* (1896), 145 Ind. 261; *Conner* v. *An-*

*drews Land, etc., Co.* (1904), 162 Ind. 338; *Kelley* v. *Bell* (1909), 172 Ind. 590; *United States Cement Co.* v. *Cooper* (1909), 172 Ind. 599; *Pittsburgh, etc., R. Co.* v. *Sudhoff* (1910), 173 Ind. 314.

Counsel for appellants assert that the trial court erred in fixing the amount of recovery against the sureties for the first term, in that it is larger in several particulars than the evidence warrants. The first of these claims grows out of the following facts: Walker on taking office on January 1, 1904, having theretofore given the bond in suit on which appellants are sureties, was entitled to receive as treasurer, and his predecessor was bound to pay over to him, the sum of $184,305.77 in money, which sum represented the balances in the various funds of which the treasurer was custodian. Settlement was made between them on that day, and Walker executed his receipt to his predecessors for the sum stated. At the time this transaction took place Walker was individually indebted to his predecessor in the sum of $10,489.90, for which the latter held his notes, and these notes were delivered to Walker, but were not assigned, and were accepted by him as so much cash, and went to make up the total sum for which his receipt was given. On the day of the settlement, and the transfer of the office, Walker's predecessor was ready and willing to pay to him the full amount of these notes in cash, together with the balance of the total sum of $184,305.77, with which he was chargeable, but Walker insisted on taking them as cash in the settlement. Upon these facts counsel state their contention to be that the misapplication of funds was made by the predecessor of Walker, and that the defalcation was his and not Walker's; that since Walker did not take into his possession money to the amount of the sum of his notes, his failure to pay this sum to his successor at the end of his first term is not a delinquency on his part for which appellants, as sureties on his first-term bond, are liable, and that to that extent the recovery adjudged against them is too

large. This unqualified contention is not urged with much earnestness, but it is insisted that the complaint is drawn on the theory alone that Walker did collect and receive 3. from his predecessor this sum, and failed to pay over a sum actually collected, while the proof shows that he did not collect and receive the sum in question, and that to permit a recovery to the extent of this sum would be to violate the rule that a plaintiff must recover, if at all, on the theory of his complaint. This latter contention is based on the assumption that the breach of the bond alleged in the complaint is as narrow as counsel have stated as before indicated. It is broader than that. It is alleged in the complaint, "that said John P. Walker as treasurer of said county of Vanderburgh, in the term beginning January 1, 1904, and ending January 1, 1906, received and collected, and was charged with and had in his possession, as such treasurer, the sum of $54,152.49 of the moneys, funds and revenues of and belonging to said county; * * * and that the conditions of said bond have been violated in this, that said John P. Walker, as such treasurer, has in noway paid over said sum of money or any part thereof," etc.

The bond in question contains the obligation required 2. in official bonds by §9111 'Burns 1908, §5528 R. S. 1881, and is binding upon principals and sureties for the faithful discharge of all the duties required by law of treasurers. The first of these was the duty imposed upon Walker to take charge of the funds of the office when tendered to him by the outgoing treasurer. It would seem to be clear that if, having the opportunity to take from his predecessor money to the amount of the funds in the treasury, he nevertheless took part of the sum in something other than money—an obligation for the payment of money, such as his own notes—he fell short of faithfully discharging his duty. And it would seem to be equally clear that he was properly chargeable with money on hands by virtue of his office to the amount represented by such notes.

It is true that the liability of sureties is not to be extended by implication beyond the terms of the contract, but such rule is not applicable in this instance. With respect to the funds of the office, the treasurer's duties are to receive, keep and disburse them (§9476 Burns 1908, §5912 R. S. 1881); and a breach of the duty to receive said funds when proffered, as in this case, by taking notes as cash, which places the treasurer in a position where he is unable to render an account, is as expressly covered by his bond as a wrongful abstraction or appropriation of the funds in his care, which likewise prevents a full and proper accounting at the close of his term. At the time of this transaction between Walker and his predecessor, Walker was treasurer, the bond in suit, on which applicants were sureties, had been theretofore given and approved, and was conditioned for the faithful performance and discharge of all the duties of the office under the law. His predecessor was not in default, for he was ready with money to the amount of Walker's notes to pay over in the settlement, and it was Walker's act as treasurer that made it possible for a shortage to exist in the public funds of which he was the custodian. There is no suggestion of fraud on the part of the outgoing treasurer in making the settlement.

The taking over from his predecessor of the funds belonging to the office of treasurer was as clearly one of the duties of Walker, as treasurer, as keeping them safely, properly disbursing them, and accounting for the remainder on hand at the end of the term. Without the giving of a bond he could not have assumed the office, could not have become qualified to hold it, nor could he have received the funds in the hands of his predecessor; and appellants, by becoming his sureties, made it possible for him to discharge this duty. He thereupon became invested with the right as treasurer to take this money into his keeping, and to refuse to take other than money. The election to take his own notes as part of the money he was entitled to receive as treasurer was his volition

as treasurer, and the act was done both under color of the office and by virtue of it, and with this power as treasurer the act of appellants in making his bond had clothed him. Had Walker refused to take his own notes in the settlement, and had Euler, his predecessor, been unable to pay the money, Walker's sureties of course would not have been chargeable and Euler's would have been. Had Euler paid the amount of these notes to Walker in cash, and had Walker immediately returned to Euler a sufficient amount to cover them, and had then received his notes from Euler, the substance of the transaction would have been the same as that which actually took place. Whatever fraud or moral turpitude there might have been involved in either case would have been Walker's, and not that of his predecessor.

Walker manifestly would be liable to account for the amount of the shortage in the funds of his first term represented by the amount of his notes. He could not rely on the claim that the funds to this extent were not paid to him by his predecessor and that such predecessor was in fact the defaulter, and such defense is one which comes within the provision of our statute (§9117 Burns 1908, §5534 R. S. 1881), that sureties may not set up as a defense.

Having received his own notes as cash, Walker became chargeable, as treasurer, with that amount of money received, and was obliged to account for it at the end of the term. Failure so to account was a breach of his bond, for which appellants, as the sureties thereon, are equally liable with him.

In the case of *County of Montmorence* v. *Wiltse* (1900), 125 Mich. 47, 83 N. W. 1010, a county treasurer received from his predecessor as cash certain township orders and due bills held against saloon-keepers, and it was held in an action on his bond that both he and his bondsmen were bound by his action, and were liable for any loss occurring by reason of a failure to realize on the orders or due bills.

For other cases holding a treasurer, as well as the sureties on his bond, chargeable as for money received where he received choses in action instead of money, see Board, etc., v. Robinson (1900), 81 Minn. 305, 84 N. W. 105, 83 Am. St. 374; Bush v. Johnson County (1896), 48 Neb. 1, 66 N. W. 1023, 32 L. R. A. 223, 58 Am. St. 673; State v. Hill (1896), 47 Neb. 456, 522, 66 N. W. 541; Board, etc., v. Fennimore (1794), 1 N. J. L. 281; Parks v. Bryant (1904), 142 Ala. 627, 38 South. 180.

The second reason for the claim that the amount of recovery awarded against appellants is too large, and that the decision is not sustained by sufficient evidence, arises

4.  from the failure of the court to allow a claim of payment to the amount of $8,708.27 on the shortage shown by the books of $54,152.49 at the end of Walker's first term. It appears that it was Walker's custom to make cash advancements out of county funds in his hands to officials, clerks, contractors for supplies and work, and others, in anticipation of the issuing of warrants therefor, and to carry memoranda of these advancements on yellow slips of paper as cash, and to deduct the amount of each individual advancement from the warrant in favor of the person to whom the advancement was made when such warrant was presented. Like memoranda of other use of the public funds for other than strictly lawful purposes were also carried as cash. At the end of Walker's first term the sum of $8,708.27 of the public funds had been used in this manner, and upon the claim that the various items making up this sum had been paid into the treasury after the close of his first term, and before his resignation, and to that extent swelled the receipts of the second term, rests the contention that part payment was made to this amount on the shortage of the term, and that the recovery was, therefore, too great to this extent. This sum was not taken into account either as a credit on the first term or a charge against the second. If payment as claimed were clearly shown by the evidence, appellants' contention

would have to be sustained. The effect would be not to de-
crease the total shortage, but to decrease that of the first
term, and proportionately to increase that of the second. A
thorough search of the record does not disclose any evidence
warranting the conclusion that this sum had been paid in
full. It is true that the experts, who examined the books,
in their report to the county board gave credit for this full
sum, but it is also true that they all testified that, so far as
they knew, no payment of any part of it had ever been
made. But there is evidence, from the testimony given by
Walker, that nothing was ever realized on these cash items,
except that there was collected on them and turned into the
treasury, between the close of Walker's first term and the
date of his resignation, the sum of $1,262.35. This evidence
is not contradicted by any other evidence given in the cause,
except to the extent that the books failed to show any repay-
ment of any of the items making up the sum of $8,708.27.

It is conceded by all parties that, deducting the lawful
disbursements of the first term from the receipts of that
term, including the amount that Walker should have taken
over from his predecessor, he should have had at the end of
his first term a cash balance of $150,034.46, but that his
actual cash balance at that time was $95,881.97, leaving an
apparent shortage at the end of his first term of $54,152.49.
It is likewise agreed that, deducting the lawful disbursements
of that part of his second term served up to the time of his
resignation on January 26, 1907, from the receipts of the
same period, together with what he should have taken over
from his first term, he should have had when he resigned a
cash balance of $89,515.16, but that his actual cash balance
at that time was $23,410.83, leaving an apparent total short-
age during his entire occupancy of the office of $66,104.33.
Deducting from this the apparent first-term shortage of
$54,152.49, we have an apparent shortage for that part of
the second term served of $11,951.84. Credits against this
apparent second-term shortage, which consisted in part of

money diverted during the second term in the same manner, and evidenced by memoranda on tickets, as in the case of the $8,708.27, before mentioned, were claimed on account of the payment of part of the items, and were allowed in the sum of $2,310.96, which left the second-term shortage, as found by the court, to be $9,640.88, and the total actual shortage of both terms to be $63,793.37, which all parties to the cause concede to be the correct amount of the total shortage. It is true that the books of the office show that the total shortage had not been reduced by payment, but the books would not necessarily show that this sum of $1,262.35 had not been paid into the treasury during the second term, and augmented the receipts from which the disbursements of that term being subtracted would fix the shortage of that term. If such payment were made by cashing warrants during the second term, against which were cash tickets that were deducted from the cash paid on the warrants, this would not appear from the books. As the uncontradicted evidence shows that $1,262.35 of the items making up the first-term shortage was paid into the county treasury during the second term, this, of course, should be credited on the first-term shortage, and charged against the second term, for in that term it was paid into the treasury, and became a part of the funds of that term upon which the shortage of that term was determined. Rogers v. State, ex rel. (1885), 99 Ind. 218, 225; Goodwine v. State, ex rel. (1881), 81 Ind. 109, 112. So it must follow that the actual shortage of the first term would be $52,890.14, and that of the second term $10,903.23. Walker gave testimony repeatedly that these latter sums represent, respectively, the actual shortage of his first and second terms, and thereby sustained his testimony that the sum of $1,262.35 was paid into the treasury during his second term. The position of relator, that there was a gross shortage for both terms of $63,793.37, is correct, and is not involved in this conclusion, for in either case the gross shortage remains the same. We hold that the finding of the

court, as to the actual shortage of the first term, is $1,262.35 in excess of the amount shown by the evidence, and that as to the actual shortage of the second term, the finding is inadequate in that sum, and to that extent appellants' contention must be sustained.

We do not hold that the trial court's conclusion of law, that the relator was not entitled to judgment against appellee surety company, was wrong. Said company had made payment in the sum of $17,749.15 on account of the shortage of that term, and this sum more than covered the augmented shortage, as heretofore stated.

Again it is urged that certain warrants drawn in Walker's favor during his first term, for salary and fees for collecting delinquent taxes during that term, but not then paid for want of funds, were paid during the second term, and the amount—$1,949.13—credited to the disbursements of that term, and that this was an error against appellants, as the credit of this sum should have gone to reduce the shortage of the first term. The proper application of this sum was a matter to be determined from the evidence, and as there is evidence in the record, which is sufficient so far as this appeal is concerned, showing that Walker took credit for these warrants as cash in making up the amount of funds in his hands at the beginning of his second term, it was proper for the court to credit to that term these disbursements in paying such warrants.

It is next argued in great detail and with much earnestness by appellants' learned counsel that the evidence shows without contradiction that payments were made by Walker during his second term which practically settled the shortage of the first term. The process by which counsel have reached this conclusion that payment had substantially been made, and that the finding against appellants was therefore excessive, is interesting and ingenious, but it is unsound and unsupported by authority. The different funds of which Walker was custodian were not kept

separate according to the amount properly credited to each particular fund and municipality, but were commingled in one deposit or amount representing the total of all the funds, and from this total sum the amount representing the first-term defalcation was abstracted at different times during that term. Without going into minute detail, it may be stated that, in substance, it is the contention of counsel that this is not a deficit due to the county, but that it is a proportional deficit due to each separate fund and municipality in severalty in that percentage of each fund that the whole shortage bears to the whole amount with which Walker was at the end of his term chargeable. It is urged that the funds belong to the various municipalities and not to Vanderburgh county, and, in effect, that the shortage in each fund constituted a separate embezzlement. It is claimed that as the uncontradicted evidence furnished by the books in the treasurer's office shows that money equal to substantially all of the ledger balances of the various funds at the end of Walker's first term was paid by him during his second term, in the due course of official business on warrants or orders, to the various persons and officers entitled thereto this worked a payment of these balances—a restitution of the moneys misappropriated by him during such first term—even if paid out of the taxes or other receipts coming into his hands during the second term; that this, to the extent of such payment, exonerated the sureties for the first term, and made those of the second term responsible.

It is true, as established by cases cited by counsel, that each municipality whose funds the treasurer is charged with the duty of collecting and paying over is a separate

7. entity, and that the county treasurer is not such an agent of the county as renders the county liable under the doctrine of *respondeat superior* to the minor subdivisions of the State within the county entitled to the respective funds which the treasurer is required by law to distribute to them; but it does not follow that the title to the money in the hands

of the county treasurer becomes vested in the several munici-
palities whenever the treasurer's books show a balance in
their favor. It is, for the purpose of such a case as this, in
bulk and in its entirety, the money of the county, and as
such, a treasurer is liable therefor on his bond. The abstrac-
tion of any part of it is an embezzlement of the funds of the
county. *Armstrong* v. *State* (1896), 145 Ind. 609; *Hollings-
worth* v. *State* (1887), 111 Ind. 289. The amount recovered
on a treasurer's bond must needs be applied in such a man-
ner as to put the various funds in the same relative condi-
tion that they would have been in had no misappropriation
occurred.

The misapplication of the funds by Walker was from the
general amount in his hands. In diverting the money he
took no account of funds. That there was any actual
6. restitution from outside sources is not claimed. The
payment of warrants was made in due course of the
business of the office, inferentially from funds coming in
from time to time, it appearing that collections were made
of practically $150,000 during the first quarter of the sec-
ond term. It does not appear that any warrants were paid,
except such as were regularly and properly drawn on the
respective funds to the persons entitled thereto, and there-
fore on the basis of a percentage of shortage in the funds
the same deficit in each that existed at the end of the first
term must have continued, except as augmented by further
misapplication in the second. Clearly it was never lessened.
The facts must lead to the conclusion that appellants claim
exoneration through the payment of regular orders by
Walker without any specific intent to cover up one embez-
zlement with another. We know of no case sustaining their
contention. Their position is contrary to the rule that the
sureties on successive official bonds of such an officer as a
county treasurer are liable for defaults only for the term
covered by their bond, a rule that rests on just and equitable
considerations, and is well settled. *Lowry* v. *State, ex rel.*

(1878), 64 Ind. 421; *Ohning* v. *City of Evansville* (1879), 66 Ind. 59, 63; *Parker* v. *Medsker* (1881), 80 Ind. 155; *Goodwine* v. *State, ex rel., supra; Rogers* v. *State, ex rel., supra; City of Detroit* v. *Weber* (1874), 29 Mich. 24; *Township of Paw Paw* v. *Eggleston* (1872), 25 Mich. 36; note to *Board, etc.,* v. *Robinson* (1900), 83 Am. St. 374, 379.

Practically all the cases cited by counsel to sustain their position recognize with approval the rule heretofore stated.

The case of *Goodwine* v. *State, ex rel., supra,* relied on by appellants to sustain their position, does not do so, but is against them. In that case a township trustee was a defaulter at the end of his first term to the extent of $2,246, which he had invested in stock for his farm. During his second term he sold this stock and applied the proceeds— $2,400—to the use of his office in reimbursement of the public funds, but notwithstanding this he was still a defaulter at the end of his second term, by reason of additional misapplication of funds during that term. In a suit against the second-term bondsmen, it was said in the opinion of this court that the trustee was a defaulter at the end of his first term, because "he did not have in his hands to turn over, and did not turn over, to his successor [himself] the amount for which he was then accountable. And had he never made good this defalcation, his prior bondsmen, and not the appellants, would have been responsible therefor. He did, however, make it good, as the facts show." The case shows an actual restitution from sources outside the public funds coming in. The case under consideration does not.

The opinion in the case of *Cook* v. *State, ex rel.* (1859), 13 Ind. 154, relied on by counsel, approved an instruction charging the jury that "if Cook [the treasurer], at the expiration of his first term, was a defaulter, and, being his own successor, used funds that came to his hands during his second term, to pay the balance against him at the end of his first term, the securities in the first bond are discharged, and the sureties in the second bond are liable for the money thus

appropriated.'' But the approval of the instruction is put upon the ground that the condition of the bond was that the treasurer should pay over according to law all moneys coming into his hands during that term, and that the instruction was pertinent to the case made by the record. The opinion does not disclose what facts were involved, and no authority is cited in support of the ruling. Neither the language of this instruction, nor an expression of similar import in the opinion in the case of *Rogers* v. *State, ex rel., supra,* can be approved as a sound statement of the law as applied to the facts in this case. Here, there was no specific application of the funds in Walker's possession during his second term with an intent to make good a deficit of his first term.

Had a stranger succeeded Walker at the expiration of his first term, the honoring of warrants by the successor, coming to him in due course, out of the public money in his hands could not be considered a vicarious restitution for Walker, nor transfer the liability of sureties from the term of Walker to that of his successor. Neither the principles involved in this case, nor their proper application, can be affected by the fact that Walker succeeded himself. The terms are distinct, and each bond covers some default or breach of duty occurring in the term for which it was given.

Appellants answered the complaint by special answers of partial payment, in which it is averred that Walker, during his first term, invested the public funds coming into his hands, by authority of his office, to the amount of $40,000 in real estate and in personal property, taking the title thereto in his own name, a particular description of all of which real estate and personal property is to the defendants unknown. Certain of the real estate and personal property is then specifically described. It is averred that since Walker purchased said property with the public funds in his possession and under his control as treasurer as aforesaid, it became and was charged with a trust in favor of said Vanderburgh county and various distributees of the various

sums so diverted and invested by said treasurer, and in favor of the plaintiff as their legal representative and by subrogation in favor of the defendants as sureties on the bond covering the period during which said public funds were so misappropriated and misapplied and invested as aforesaid, and that, by reason of the premises, Vanderburgh county, and the plaintiff as its representative, and the defendants by subrogation are entitled to follow the funds, so misapplied and misappropriated and invested as aforesaid, into the loans so made by said Walker out of said funds as aforesaid, and to have them applied upon the shortage, if any, occurring during the period or term covered by the bond executed by them as aforesaid. It avers that the Federal Union Surety Company, on or about January 18, 1907, learned that the shortage existed in the accounts of John P. Walker, and that he was a defaulter to a considerable amount in both his first and second terms; that it entered into negotiations with him, and by promising to aid him in every way possible to escape punishment for embezzlement of which he was guilty as aforesaid, and by other means to the defendants unknown, induced him to convey, on or about January 18, 1907, all the described real estate, and to assign and deliver said personal property, including the unpaid balance due on said loans, and also other like real estate and personal property purchased by said John P. Walker with public funds in his hands as treasurer during his first term —the exact description whereof is unknown to defendants— to Clarence Abbott, then and there an officer and employe of said Federal Union Surety Company; that said conveyance, transfer and assignment to said Abbott in trust as aforesaid were made without consideration; that at the times said property was so purchased by said Walker and paid for with public funds in his hands as treasurer during his first term, and at the time of the conveyance, sale and transfer thereof to said Abbott, and at all times thereafter, said John P. Walker was and is now wholly insolvent and unable to pay

his debts, and had not at said times and has not now suffi-
cient property subject to execution to repay to Vanderburgh
county and to the various owners thereof the public funds
which he misappropriated and misapplied in payment for
said property and in making said investments and loans. It
is further averred that immediately after the execution of
said conveyance to said Abbott, and the sale and transfer to
him of said personal property, he took possession thereof in
trust for defendant Federal Union Surety Company; that
said Federal Union Surety Company proceeded at once,
either through said Abbott or otherwise, to collect the re-
mainder on said loan, and that said Federal Union Surety
Company and said Abbott appropriated all said property,
both real and personal, and converted it to their own use
and benefit. It is averred that out of the proceeds from the
sale of said property the Federal Union Surety Company
paid into the treasury of Vanderburgh county $17,749.15,
and defendants say that thereby the alleged defalcation of
Walker existing at and subsequent to the end of his term of
office for the first term was, prior to the commencement of
this action, to the extent of said sum of $17,749.15 paid, dis-
charged and accounted for to his successor in office.

Demurrers were overruled to these answers, and the facts
alleged in them and the relief sought by them were a part
of the issues tried.

Appellants also filed a cross-complaint and counterclaim
against relator, setting forth the same facts as are averred
in these answers, and asking that Abbott be made a party,
and that the plaintiff and the Federal Union Surety Com-
pany be required to answer as to the property described, and
any and all other property purchased by said John P.
Walker during his first term and conveyed, sold, transferred
and assigned to Clarence M. Abbott, as aforesaid; that the
Federal Union Surety Company be required to answer as to
the disposition made by it or said Clarence M. Abbott, by
its direction, of any or all of the real estate and personal

property sold and conveyed to said Abbott as aforesaid; that a trust be declared in favor of the cross-complainants, as well as the plaintiff, in and to all of the real estate and personal property of every kind purchased by said John P. Walker and paid for out of the public funds coming into his hands, in his possession and under his control as treasurer between January 1, 1904, and January 1, 1906; that defendant Federal Union Surety Company be required to answer concerning, and to account for the proceeds of, all of said property, real and personal, hereinabove described, and any other property sold or conveyed by said John P. Walker to said Clarence M. Abbott, or any other person, for its benefit as aforesaid; that said Federal Union Surety Company be required to account for, and to pay into the treasury of Vanderburgh county, the full value of all property so purchased by said John P. Walker during his first term and paid for with public funds, and conveyed to Clarence M. Abbott for the benefit of said Federal Union Surety Company, and that the value of said property be declared, as between these cross-complainants and said Federal Union Surety Company, to be a credit upon the shortage, if any, occurring during the term covered by the bond executed by them; that said Clarence M. Abbott be made a party defendant hereto, and required to answer concerning and account for all property, real and personal, received by him from said John P. Walker, and that it be subject to sale for the satisfaction of any balance of the shortage, if any, occurring during said first term that may remain unpaid after the application of the credits to which these cross-complainants are entitled; that the sum of money paid into the treasury of Vanderburgh county by said Federal Union Surety Company be declared to be a credit and payment upon the shortage, if any, of said John P. Walker during his first term, for judgment against defendants Federal Union Surety Company and Clarence M. Abbott for $40,000, and for all other proper relief in the premises. Demurrers

of the relator and of the Federal Union Surety Company were sustained to this pleading.

It is contended by appellants' counsel that the finding and judgment against their clients should have been reduced, under the evidence given on the issue formed by said answers of partial payment, in the amount of the payment found to have been made by appellee surety company. It is finally contended that the court erred in sustaining the demurrers to the cross-complaint. With the consideration and determination of these questions, all questions presented will have been disposed of.

It is shown by the evidence that shortly before his resignation Walker's defalcation became known, with some uncertainty as to the total amount and the proper division of it between the two terms; that appellee surety company early learned of the conditions, and through its agent and vice-president, Abbott, procured Walker to turn over his property to him for such surety company, to indemnify it for any loss it might sustain as surety for Walker in his second term. Under the agreement by which this was done, enough of this property was to be converted into cash to cover the second-term shortage, and the balance was to be turned back to Walker, or to some one designated by him, and the company was to surrender, and did surrender, to Walker two contracts of his agreeing to indemnify it from loss in becoming his surety on his second-term bond. This was a part of the plan then under consideration by Walker and his friends to raise money on his property and otherwise to make good his total defalcation. It was his desire to devote all of his property to the payment of his entire shortage, so far as it would go. As shown by the evidence and stated in the court's findings, all of this property so turned over to appellee surety company was purchased with funds of the county in Walker's custody during his first term, except in two instances in which money taken during the second term in sums of $1,000 each was so used. After securing itself in

this manner, appellee surety company, before this action was brought, paid into the treasury of Vanderburgh county, for itself and Walker, out of its own funds, the sum of $17,-749.15, all the parties then believing that this was the amount of his second-term shortage, and that the first-term shortage was correspondingly less. This sum the county accepted, on the condition that the second-term liability should not be found to be greater than this, otherwise that it should be payment *pro tanto,* and it still retains the amount. After this payment, and before the trial, the surety company turned certain of the real estate and personal property procured from Walker into cash, reimbursed itself to the amount of $17,309.99, and returned the remainder to Walker. It appears from the evidence that this remaining property was being held by Walker at the time of the trial, to be applied toward the payment of any judgment that might be rendered, and indeed, so far as the real estate was concerned, such judgment would become a lien on it as of the date of the beginning of the cause of action. §636 Burns 1908, §609 R. S. 1881.

That appellants can have no claim on the excess of $17,-749.15, the sum paid in on the first-term shortage, over $17,309.99, the sum realized by appellee surety company on that part of Walker's property converted into cash by it, amounting to $439.16, is clear, for in any view of the matter, this at least was the money of the surety company. We think it equally clear that as to the excess of the sum of $17,309.99 over the actual amount of the second-term shortage, as hereinbefore stated in this opinion, the sum of $10,903.23, which excess amounts to $6,406.76, appellee Federal Union Surety Company can make no just claim, and Walker is making none, as against relator or appellants. While the total sum paid in by that company was in reality, at the time the payment was made, its own money, yet it was then amply secured

against the payment, by the fact that it held property belonging to Walker of a far greater value than the sum paid. The payment was made by the surety company and Walker. Said company was shortly afterwards reimbursed out of Walker's property to the extent of $17,309.99. The claim of counsel for the surety company, that it was a *bona fide* purchaser for a valuable consideration of the property of Walker that it sold, in that it agreed to and did pay his second-term shortage and released him from liability on his indemnifying contracts with it, and that therefore it has a right to retain the proceeds of the property sold by it, if tenable so far as the sum paid on its liability is concerned, is unconscionable as applied to the excess, and against the letter and spirit of its contract with Walker, without giving consideration to the equities of appellants. If it gave value for that part of Walker's property necessary to satisfy its responsibility for him on his second-term bond, by the very terms of its agreement with him, by which it measures its rights, it was bound to turn back to him all not necessary for that purpose. This sum was paid as a restitution by Walker on a defalcation, believed to be that of the second term. He desired to devote all of his property to the reduction of his entire shortage. The fact that for its own exoneration appellee surety company was vigilant, and hurried Walker to a payment, out of his own property, of a sum greater than was necessary for its exoneration, cannot deprive him and appellants as his first-term sureties of the benefit of that part of the sum paid over the amount of the second-term liability, on which it had no claim whatever. In legal contemplation, when the surety company was reimbursed we think the payment of the excess over the second-term liability became the payment of Walker to that extent, and that the excess in the sum stated should have been credited to the amount found to be due at the end of the first term. The county had retained the amount and applied it

to a reduction of the total defalcation. We think there could be no possible doubt that had the actual liability of appellee surety company been known when the payment was made by it, and it had paid in that sum and no more, retaining for itself the excess, the county could have compelled it to account for that excess. It would just as certainly be true that upon payment by appellants of their liability as first-term sureties they would be subrogated to the rights of the county to such excess. Then it must follow that this sum having been paid in, the application of it should be ordered without indirection, for equity regards that as done which ought to have been done. With this view of the matter, if the amount of the second-term shortage was, as found by the court, $9,640.88, this would make an excess of $7,669.11, or the additional sum of $1,262.35, to be applied to the reduction of the first-term shortage of $54,152.49, as found by the court, which would bring the same result in reducing the amount for which judgment should have been given against appellants under the issue made by these answers of partial payment.

We are finally to consider whether the record affirmatively shows that appellants were harmed by the action of the trial court in sustaining the demurrers of appellees to the cross-complaint. It is stated by counsel for appellants, "that the object of the cross-complaint was to prevent a loss and injury accruing to appellants as sureties on the bond of Walker during his first term, which loss would be irreparable, unless the property into which Walker had converted the public funds in his first term was applied to the exoneration of appellants as his sureties." It seems that by the pleading they are merely attempting to bring property purchased by Walker with funds that he abstracted during his first term, and which the county would have a right to follow, within reach of a judgment against him and appellants as his sureties for that term, to the end that the judgment that established the suretyship of appel-

lants. and directed that Walker's property be first exhausted, might be effective for their exoneration. All of the affirmative relief asked is against the surety company; none is asked against relator, and counsel do not point out wherein in any way the sustaining of the relator's demurrer to the cross-complaint was harmful to their clients, and we see none. It is conceded by counsel that the relator was entitled to his judgment against their clients, but contend that he could not proceed with execution upon it until the rights as between the principal and surety were determined according to equity, and until provision was made by which the property of the principal would be first exhausted before going upon the property of the surety. That is, it is conceded that the relator might proceed to trial and judgment upon his complaint against the principal and sureties on the bonds fixing the amounts to be recovered. Relator's right to a judgment was not dependent upon the result of a trial of the issues between the sureties and their principal. The county was not required to follow the misapplied funds into the property in which it was invested, whatever its right to do so, but could rely on the bonds. The effect of the facts pleaded in the cross-complaint, so far as the relator was concerned, would be merely upon the application of the money paid in. This relief was open to appellants under the answers that have been considered. No error was committed against appellants in sustaining relator's demurrer to the cross-complaint.

In considering whether appellants were harmed by the sustaining of the demurrer of appellee surety company to their cross-complaint, we are to keep in mind their own interpretation of their pleading and designation of its object. That, in effect, it was to prevent from becoming lost to them that part of it which they would be entitled to follow by the equitable principles of subrogation to the rights of the county, after the county had its judg-

ment against appellants and to keep it within reach of their rights. Before filing this cross-complaint, or sustaining the demurrer to it, that part of the property of Walker transferred and conveyed to the surety company not converted into money by it and paid to the county, had been, by it, returned to Walker, and was held by him to be subject to the payment of any judgment rendered against him and appellants. In his testimony given in the trial, Walker expressed his entire willingness, in answers given to questions propounded by appellants' counsel, to convey and transfer this property as the court might direct for this purpose. So far as the real estate was concerned, the statute (§636 Burns 1908, §609 R. S. 1881) had fastened a lien on it to the extent of the liability of the first-term bond. It was out of the control of the surety company. The judgment of the lower court established the suretyship of appellants, and provided that the property of Walker should be exhausted before resorting to that of appellants. As to this property, no relief could be given to appellants against the surety company. We have seen that appellants are entitled to the application on the liability of the first term of the excess of $7,669.11 left of the proceeds of that part of Walker's property sold by the surety company. The cross-complaint could reach only the proceeds of Walker's real estate to the extent of $9,640.88. Of this sum, at least $2,000 was the proceeds of property purchased by Walker with money taken during his second term, and the surety company, as the surety on the bond of that term, should be relieved by this amount, rather than appellants, who can have no claim on it by subrogation or otherwise. Appellants' cross-complaint then, if it had been sufficient in all of its essential allegations against said surety company to set aside the conveyance or recover the proceeds of Walker's property for their own exoneration, would have been good for relief at most to the sum of $7,640.88. The surety company is solvent and responsible,

and appellants, if they have a cause of action against it for this sum may bring it and determine it with as much assurance after they have paid as they might have done in this action. The facts do not justify a fear of irreparable or irretrievable loss that would invoke a remedy in the nature of a bill *quia timet* as the only sure relief to appellants. We cannot see that the doctrine stated in the case of *Barnes* v. *Sammons* (1891), 128 Ind. 596, 600, that a surety who has not paid the debt cannot bring suit to set aside a fraudulent conveyance of real estate made by the principal debtor, and have the land declared subject to the payment of the debt, is not applicable to this case as the record presents it.

We do not mean to hold that had an issue been formed in this case on a proper and sufficient cross-complaint to try the equitable rights of appellants on one side and appellee surety company on the other to that part of the money received by the latter from property of Walker paid for out of the funds of his first term, and the matter correctly determined, such determination would have been unauthorized and premature. It would have been in harmony with the spirit of our practice to have the rights of all the parties in the matter in controversy settled in one action.

But the question before us is whether appellants were harmed to a degree justifying a reversal of this cause, and also compelling an expensive retrial of the whole case to the delay and detriment of public and private interests, when appellants, upon discharging their contract obligations still have as ample a remedy before them as they had when they presented their cross-complaint for the consideration of the court in this action.

It being manifest that the record presents a case that does not justify a retrial, the judgment is reversed, with instructions to the lower court to restate its conclusions of law, to

the effect that the sum due from said Walker and the liability of appellants on his bond at the end of his first

term, December 31, 1905, is..............$54,152.49
Interest thereon from January 1, 1906, to
    February 28, 1907.....................  3,790.67

Making a total to time of partial payment,
    February 28, 1907.....................$57,943.16
From which sum there should be deducted
    partial payment, as before indicated.....  7,669.11

Leaving .................................$50,274.05
Interest thereon from March 1, 1907, to
    November 23, 1908, the date of the judg-
    ment ...............................  4,960.37

Making a total of principal and interest....$55,234.42
Together with ten per cent damages thereon  5,523.44

Making the total amount of the judgment
    which should be rendered against Walker
    and appellants as of the date of November
    23, 1908 ............................$60,757.86

The lower court is ordered and directed to enter judgment for said sum in favor of relator and against John P. Walker and appellants as of that date for said sum, to draw interest at the rate of six per cent from said date until paid, together with costs, all to be levied and collected without relief from valuation and appraisement laws, and that the property of Walker be first exhausted before resorting to that of appellants.

The costs of this appeal are ordered taxed and adjudged against appellee Federal Union Surety Company.